## BOARD OF REGENTS, Petitioner v. CARTER, et al. Respondents

### (228 N.W.2d 621)

(File Nos. 11310, 11312, 11313 and 11323. Opinion filed April 25, 1975)

W. A. McCullen and Allen G. Nelson, Bangs, McCullen, Butler, Foye & Simmons, Rapid City, for petitioner and applicant.

Dennis W. Finch, Pierre, for respondent and appellant Henry E. Carter.

Harry H. Smith, Sioux City, Iowa, for respondent and appellant Local 2446.

Thomas M. Maher, Pierre, for respondent and appellant SDHEFA.

Kermit A. Sande, Atty. Gen., John Dewell, Asst. Atty. Gen., Pierre, for intervenor and appellant.

DOYLE, Justice.

This case involves two issues. The first is whether the South Dakota Board of Regents (Regents) may hire the services of independent counsel in bringing this action. The South Dakota Attorney General (Attorney General), as intervenor in this case, maintains that the Regents may not do so. The second is whether SDCL 3-18 is an unconstitutional infringement upon the Regents' control of the state's educational institutions. We hold that the Regents may employ counsel outside the Attorney General's office in bringing this suit and that SDCL 3-18, this state's public employee labor relations statute, is constitutional as applied to the Regents.

The facts at hand stem from the attempts of two separate groups of the Regents' employees to organize and gain recognition as bargaining units in their relations with the Regents. On April 29, 1972, a group known as the South Dakota Colleges and Universities Classified Employees Association (CEA) filed with the Regents for recognition as the representative of all classified employees, including clerical and blue collar employees. On May 10, 1972, Local 2446, American Federation of State, County and Municipal Employees, AFL-CIO (Local 2446) also filed with the Regents for recognition as the representative of only the blue collar employees. This latter request was later denied by the Regents who recognized the CEA as the bargaining unit representative on June 20, 1972. Local 2446 then filed a petition on June 21, 1972, with the South Dakota Commission of Labor and Management Relations. This procedure is specified in SDCL 3-18-4 and SDCL 3-18-5 as the method for determining the composition of the proper bargaining unit and for selecting the

proper representative of that unit when, as in this case, the recognition granted by the public employer is questioned by one or more of the parties.[1]

The Commissioner of Labor and Management Relations, Henry E. Carter (Carter), conducted the appropriate hearings and issued an order on January 4, 1973, setting forth his findings thereon. Pursuant to SDCL 3-18-4, Carter defined the bargaining unit as the blue collar employees only,[2] and pursuant to SDCL 3-18-5, Carter ordered an election by the employees to select the bargaining representative. Petitions for review of the decision

---

1. SDCL 3-18-4: *"Investigation and hearing on refusal to grant formal recognition or on question of designation of representation unit.* — When a governmental agency declines to grant formal recognition or when a question concerning the designation of a representation unit is raised by the governmental agency, labor or employee organization, or employees, the department of manpower affairs or any person designated by it shall, at the request of any of the parties, investigate such question and, after a hearing if requested by any party, rule on the definition of the appropriate representation unit. The department shall certify to the parties in writing the proper definition of the unit. In defining the unit, the department shall take into consideration, along with other relevant factors, the principles of efficient administration of government, the principles and the coverage of uniform comprehensive position classification and compensation plans in the governmental agency, the history and extent of organization, occupational classification, administrative and supervisory levels of authority, geographical location, and the recommendations of the parties."
SDCL 3-18-5: *"Question on representative of employees — Petition for investigation or certification — Hearing to ascertain representatives for formal recognition.* — When a question concerning the representative of employees is raised by the governmental agency, labor or employee organization, or employees, the department of manpower affairs or any person designated by it shall, at the request of any of the parties, investigate such question and certify to the parties in writing, the name or names of the representatives that have been designated or selected. The filing of a petition for the investigation or certification of a representative of employees by any of the parties shall constitute a question within the meaning of this section. In any such investigation, the department may provide for an appropriate hearing, and shall take a secret ballot of employees to ascertain such representatives for the purposes of formal recognition. If the department has certified a formally recognized representative in a unit of employees as provided in § 3-18-4, it shall not be required to consider the matter again for a period of one year unless it appears to it that sufficient reason exists."

2. This was the unit proposed by Local 2446. CEA, as noted previously, wished to represent a unit consisting of both blue collar and clerical employees.

were filed by CEA and the Regents, which were denied by Carter on January 25, 1973.

On October 16, 1972, the South Dakota Higher Education Faculty Association (HEFA) also requested recognition by the Regents as the representative of a second group of employees. This request was evidently later denied by the Regents in that the HEFA petitioned Carter on December 20, 1972, to exercise his powers under SDCL 3-18. On January 19, 1972, Carter set for hearing on February 3, 1973, the issues involved in the dispute between HEFA and the Regents.

The Regents then applied to the Circuit Court of Hughes County for a writ of prohibition to prevent Carter from asserting jurisdiction in each case. The Regents contend that the South Dakota Constitution, Art. XIV, § 3, vested control of all employees of the state educational institutions in the Regents, and any attempt by the legislature to infringe on such control under SDCL 3-18 was unconstitutional. The circuit court issued an alternative writ of prohibition on January 29, 1973, ordering Carter to halt any further proceedings in connection with the petitions and to show cause why he should not be absolutely restrained from asserting his jurisdiction in these matters. On February 13, 1973, the circuit court issued an order joining Local 2446 and the HEFA as respondents with Carter in this action.

In these matters the Regents have retained independent counsel and have been so represented. The Attorney General had given neither permission to seek counsel outside his office nor permission to bring this action. The Attorney General contends the Regents have no authority to hire independent counsel or bring this action without his permission in that he is the sole legal officer of the state and its agencies. The circuit court, by order dated February 15, 1973, authorized the Attorney General to intervene in these matters.

On May 8, 1973, the circuit court issued a peremptory writ of prohibition preventing Carter from interfering with the labor relations of the Regents on the grounds that SDCL 3-18 is unconstitutional. The circuit court also dismissed the Attorney General's complaint holding that Art. IV, of the South Dakota

Constitution, commonly known as the Executive Article, did not give the Attorney General powers that would make the employment of independent counsel by the Regents and the bringing of the instant action impermissible. From this judgment Carter, Local 2446, HEFA and the Attorney General all appeal.

◼ Respondents Carter, Local 2446 and HEFA, list ten assignments of error on the part of the circuit court. These assignments, while somewhat repetitious, set forth the following contentions:

1. Although the South Dakota Constitution Art. XIV, § 3, vests the Regents with control and management of the state educational institutions, such control is subject to such rules and restrictions as the legislature shall provide.

2. The Regents in recognizing the CEA as the representative for the clerical and blue collar workers were in reality attempting to block Local 2446's organizational efforts among the blue collar workers. This interference by the Regents was an infringement on the freedom of association and the equal protection of the laws guaranteed to the blue collar workers by the First and Fourteenth Amendments to the United States Constitution and by 42 U.S.C.A. § 1983.

3. The Regents in recognizing the CEA were, on June 20, 1972, using the provisions of SDCL 3-18, and thereby waived the right to question that statute when used by another party.

4. The remedy of a peremptory writ of prohibition is improper inasmuch as an adequate remedy exists at law in the form of formal appeal from Carter's decision.

The Attorney General lists seven assignments of error which can be summarized as follows: The South Dakota Constitution does not grant the Regents the power to institute their own lawsuits

and hire their own lawyer, and any legislative attempt to confer that power is an unconstitutional infringement on the power reserved to the Attorney General by Art. IV of the South Dakota Constitution. Since we find that the issue of whether the Regents' control is subject to legislative rules and restrictions disposes of both appeals here, we will confine this opinion to that fundamental issue.

The South Dakota Constitution, Art. XIV, § 3, states:

"The state university, the agriculture college, the school of mines and technology, the normal schools, a school for the deaf, a school for the blind, and all other educational institutions that may be sustained either wholly or in part by the state shall be under the control of a board of five members appointed by the Governor and confirmed by the senate *under such rules and restrictions as the Legislature shall provide.* The Legislature may increase the number of members to nine." (emphasis supplied)

The Regents contend, and the circuit court so held, that the plain meaning of the italicized phrase is to place rules and restrictions on appointments by the governor and confirmations by the senate. To allow the phrase in question to modify the word "control" would be, at the very least, grammatically awkward and quite possibly incorrect. While we agree that one of the primary rules of statutory and constitutional construction is to give words and phrases their plain meaning and effect, Boe v. Foss, 1956, 76 S.D. 295, 77 N.W.2d 1, and while we also agree that the reading given Art. XIV, § 3, by the circuit court is grammatically correct, we feel constrained, not only by previous decisions of this court but also by sound policy considerations, to hold otherwise. To affirm the circuit court's construction of Art. XIV, § 3, would establish the Regents as a fourth branch of government independent of any legislative policies. This, we believe, could not have been the intent of the people when they delegated their power to the Regents through Art. XIV, § 3.

Normally, the fundamental question in this case would be whether Art. XIV, § 3, is self-executing. If not, legislative

implementation might be necessary to give the Regents any control at all. In that case, any powers of the Regents would be legislatively delegated, indicating the ability of the legislature to rule and restrict. See Synod of Dakota v. State, 1891, 2 S.D. 366, 50 N.W. 632; State v. Bradford, 1899, 12 S.D. 207, 80 N.W. 143; State v. South Dakota Rural Credits Board, 1922, 45 S.D. 619, 189 N.W. 704.

As I state later, we do not find the resolution of this issue necessary to this case. A short discussion, however, is necessary for us to understand the nature of the Regents' power. In State v. Sheldon, 1896, 8 S.D. 525, 67 N.W. 613, it was held that the old Art. XIV, § 3,[3] did not require senate confirmation in filling a vacancy created by the expiration of an earlier term. The court found that the legislature had not implemented the senate confirmation requirement.

> "Has the constitution provided a mode for filling the vacancy by Sec. 3, Art. 14, of the constitution, which reads as follows: 'The State University, the Agricultural College * * * shall be under the control of a board of nine members appointed by the governor and confirmed by the senate, to be designated the "Regents of Education." They shall hold their office for six years, three retiring every second year.' *It is quite clear that this is not a self-executing provision, but one which requires legislation to render its provisions effective.* It will be observed that the constitutional provision does not assume to fix the time, or regulate the manner of making the appointment. It simply makes general provisions upon the subject, binding upon the legislature and limiting and controlling its power to legislate; but with-

---

3. The old Art. XIV, § 3, read: "The state university, the agricultural college, the normal schools and all other educational institutions that may be sustained either wholly or in part by the state shall be under the control of a board of nine members, appointed by the governor and confirmed by the senate, to be designated the regents of education. They shall hold their office for six years, three retiring every second year. The regents in connection with the faculty of each institution shall fix·the course of study in the same. The compensation of the regents shall be fixed by the legislature."

out legislative action full effect cannot be given to the section." 8 S.D. 525, 528, 67 N.W. 613, 614. (emphasis supplied)

In State v. Herried, 1897, 10 S.D. 109, 72 N.W. 93, one of the issues was whether the amended Art. XIV, § 3, which remains intact, required the dissolution of the old Board of Regents and the creation of a new Board.

"A careful construction of the entire joint resolution (amendment) leads to the conclusion that the legislature intended, if the proposed amendment were adopted, that the local boards should cease to exist when it took effect, and that the control of the educational institutions should be exercised by the board of regents until the legislature, by appropriate enactments, could create a new board, agreeably to the constitution as amended. This appears to have been what was intended. It is the construction placed upon the matter by the legislature, and there seems to be no satisfactory reason for adopting any other view." 10 S.D. 109, 122, 72 N.W. 93, 97. [4]

We found, in effect, that the new provision required a new board, but the constitution alone could not effect this change. It could neither dissolve the old nor create the new, this the legislature had to do.

■ While these two cases indicate the executory nature of Art. XIV, § 3, Worzella v. Board of Regents of Education, 1958, 77 S.D. 447, 93 N.W.2d 411, requires us to hold that at the very least the Regents' control over employees has its source in the

---

4. The Regents here note that the quoted passage requires that "the control of the educational institutions should be exercised by the board of regents * * *." The Regents say absolute control should rest with them. We believe, however, that the passage should be read in the context of the amendment's abolition of the several boards of trustees administering each college under the guidance of the Regents. The passage, we believe, was not intended to describe the extent of the Regents' control, but only to show that they no longer shared that control with the numerous boards of trustees.

constitution and not the legislature. Whether this means Art. XIV, § 3, is self-executing or whether it means the provision is executory with powers springing from the constitution upon implementation, we have no occasion to decide.

In Worzella v. Board of Regents of Education, supra, the fact situation involved a tenured professor at State College who was summarily dismissed by the Regents without regard to their own tenure policy. This policy, if followed, prevented the Regents from dismissing a tenured instructor unless discharge was recommended by the local tenure committee and the president of the institution. The issue was whether the Regents could be bound by this policy which amounted to a delegation of the right to dismiss employees.

Judge Hanson, in speaking for a unanimous court, noted that "The Board of Regents is a constitutionally created administrative body charged with the control of all institutions of higher learning 'under such rules and restrictions as the legislature shall provide.' " The court then noted statutes now compiled under SDCL 13-49-14, 13-53-4, and 13-53-5,[5] and said in parts pertinent to our discussion:

---

5. SDCL 13-49-14: *"Employment of instructors and employees for institutions — Compensation and terms of employment — Political opinions not considered.* —The board of regents is authorized to employ and dismiss all officers, instructors, and employees of such institutions, necessary to the proper management thereof, to determine their number, qualifications, and duties, fix the term of their employment, and rate and manner of their compensation, provide for a sabbatical leave on part pay, and provide for a retirement program; provided, that no person shall be employed or dismissed by reason of any sectarian or political opinions held."

SDCL 13-53-4: *"Rules and regulations for management of institutions.* — The board of regents shall have power to enact and enforce all rules and regulations, not in conflict with any law, and deemed necessary by it for the wise and successful management of the institutions under its control and for the government of students and employees therein."

SDCL 13-53-5: *"Delegation of authority to school officials.* —The board may delegate provisionally to the president, dean, principal, or faculty of any school under its control, so much of the authority conferred by § 13-53-4 as in its judgment seems proper and in accordance with the usual custom in such cases."

"The above statutory provisions merely confirm and clarify the Board of Regents' constitutional power to employ and dismiss all officers, instructors, and employees at all institutions under its control. These provisions become a part of every contract of employment entered into by the Board. (citation omitted) It cannot be restricted, surrendered, or delegated away. Our constitution prescribes that our state university and colleges 'shall be under the control' of the Board of Regents. Without the right to employ, and the power to discharge, its employees the Board loses its *constitutional* right of control.   *   *   *

"Under SDC 15.0714 the Board of Regents 'may delegate provisionally to the president, dean, principal, or faculty of any school under its control, so much of the authority conferred by this section as in its judgment seems proper   *   *   *.' This is a limited power. It does not empower the Board to delegate away all of its powers or its *constitutional duty* of control. Under its provisions the Board may only delegate the limited authority conferred on it by the same section.

*   *   *   *   *   *

"Such delegation of authority to subordinates is an unlawful encroachment upon the Board of Regents' constitutional and statutory power of control over such college." 77 S.D. 447, 450-52, 93 N.W.2d 411, 413-14. (emphasis supplied)

We read Worzella as finding the Regents' control over their employees to be constitutional and not delegated. The statutes in question granted the Regents certain powers and then allowed the delegation of those powers. In holding that the Regents could not delegate their control over employees, we necessarily implied that that control was something those statutes had not granted and certainly could not remove.

While we find that the Regents' control over employees is organic, we do not agree with the circuit court's construction of the "rules and restrictions" clause. We have consistently recog-

nized that phrase as modifying the word "control." In Johnson v. Jones, 1927, 52 S.D. 64, 216 N.W. 584, we said:

> "Matters of policy are in the exclusive control of the board so long as it keeps within constitutional and statutory provisions." 52 S.D. at 68, 216 N.W. at 585.

In later cases we noted:

> "The Constitution places these schools in 'control' of the regents 'under such rules and restrictions as the legislature shall provide.' * * * And though it be conceded the regents have very broad powers in respect to the curricula of the schools under their control, it is self-evident they cannot by the exercise of that power change [the schools'] character."

State v. Dailey, 1931, 57 S.D. 554, 560, 234 N.W. 45, 48.

> "The Constitution places the State College of Agriculture and Mechanic Arts and other educational institutions under the 'control' of the regents, 'under such rules and restrictions as the legislature shall provide.' * * * These powers are broad and comprehensive and *if there are no limitations or restrictions imposed by the legislature* the power to construct a building without express authorization from the legislature exists." State College Development Ass'n. v. Nissen, 1938, 66 S.D. 287, 294, 281 N.W. 907, 910. (emphasis supplied)

> "Subject to the power of the Legislature to impose restrictions or make rules to guide its exercise, the sovereign people intended the Board should be clothed with power to control or manage these institutions." Boe v. Foss, 1956, 76 S.D. 295, 313, 77 N.W.2d 1, 11.

> "The quoted statute was enacted in the exercise of the constitutional power of the Legislature to restrict the powers of the Board of Regents." Boe v. Foss, 1956, 76 S.D. at 317, 77 N.W.2d at 13.

See also our discussion of Worzella v. Board of Regents of Education, supra.

■ There has been no ambiguity in this court's interpretation of Art. XIV, § 3—the Regents' control is subject to "such rules and restrictions as the Legislature shall provide." The quoted phrase does not merely modify the means by which the governor may appoint and the senate may confirm. This has consistently been our interpretation, and we feel that any changes to be made in this long-established principle should be made by the people and not by this court.

■ Having established the ability of the legislature to restrict the Regents' control, we must now decide the limits of that restraint. The language of the constitution itself provides some guidelines—"rules and restrictions" do not erase; they must stop short of removing all power. In addition, Worzella v. Board of Regents of Education, supra, states that a statute allowing the board to delegate its authority must stop short of "empower(ing) the Board to delegate away all of its powers or its constitutional duty of control." 77 S.D. 447, 451, 93 N.W.2d 411, 413. The court there found that the inability to dismiss employees without a recommendation from the school officials would be a total loss of control.

■ We believe that SDCL 3-18 falls within those limits. The statute requires the Commissioner of Labor and Management Relations to define the appropriate bargaining unit. SDCL 3-18-4. It also requires the employees to choose, by secret ballot, the representative, and that they negotiate in good faith. "Such obligation does not compel either party to agree to a proposal or require the making of a concession but shall require a statement of rationale for any position taken by either party in negotiations." SDCL 3-18-2. The ability of the Regents to unilaterally set salaries, discharge employees, or establish employment qualifications is left intact. The board's basic right of control is left untouched, and SDCL 3-18 is, therefore, a permissible restriction on the exercise of that control.

This analysis does not stop here, however. Just as the constitution allows legislative restraint, it also allows the legislature to make rules governing the direction of the Regents' control.

The Attorney General maintains that he is constitutionally the sole legal officer of the state, and that any attempt by a state agency to control its own legal matters is impermissible.[6] We find strong support for this contention in State v. Wells, 1961, 79 S.D. 389, 112 N.W.2d 601. There this court held a statute permitting the South Dakota Employment Security Department its own attorney was constitutional so long as that lawyer was " 'under the supervision, control, and direction of the Attorney General,' " and so long as "such exercise could not be considered inimical to the constitutional powers of the Attorney General." 79 S.D. 389, 399, 112 N.W.2d 601, 606.

■ We find Wells, however, to be inapposite here. The Employment Security Department was created by the legislature operating within constitutional limits. Assuming, *arguendo,* that the Attorney General is correct, those limits on the legislature exist where the constitution has reserved certain rights to the Attorney General. We are not, however, dealing only with the constitutional grant of powers to the Attorney General. The constitution must be read as a whole, and we must give effect to all constitutional provisions involved. Haggart v. Alton, 1912, 29 S.D. 509, 137 N.W. 372. Article XIV, § 3, allows the legislature to make rules governing the form of the Regents' control, and one such rule is SDCL 13-49-11:

> "*Corporate powers of board—Management of property.*—The board of regents is, and it and its successors in office shall continue to be a corporation, or body corporate, with power to sue and be sued, to hold and manage, for the purposes for which they were established, any property belonging to the educational institutions under its control, collectively or severally, of which it shall in any manner become possessed."[7]

6. The Attorney General has filed a petition to allow the withdrawal of his appeal. The grounds for that petition were that, in the Attorney General's judgment, the law and the best interests of the people are contrary to his position here. In view of our opinion, we summarily deny this petition.

7. Were we to hold Art. XIV, § 3, executory, this statute could be construed as the form the legislature gave the Regents upon implementation of the present Art. XIV, § 3; cf. State v. Herried, supra. If the constitution required the legislature to create the Regents, surely the legislature could give the Regents those powers necessary to the exercise of control without violating any grant of power to the Attorney General.

The Regents have been given the power "to sue and be sued." We hold that such power necessarily includes the power to sue and hire an attorney without the Attorney General's consent. See People v. Barrett, 1943, 382 Ill. 321, 46 N.E.2d 951. A statutory grant of power includes the authority to employ the means necessary for the exercise of that power. State v. Nestos, 1922, 48 N.D. 894, 187 N.W. 233. See also Wisconsin Granite Co. v. State, 1929, 54 S.D. 482, 223 N.W. 600. If the Attorney General could control the Regents' litigation, the power to sue and be sued would evaporate, as would their constitutionally granted control over the state's colleges and universities.

The portion of the circuit court's decision dismissing the Attorney General's verified complaint in intervention is affirmed. That portion of the decision ordering a peremptory writ of prohibition against Carter is reversed and remanded with instructions to enter an order dismissing the petition of the board of regents.

DUNN, C. J., concurs.

BIEGELMEIER, J., concurs by opinion.

WINANS and WOLLMAN, JJ., dissent in part and concur in part.

BIEGELMEIER, Retired Justice, who at the time of oral argument was a member of the court, sitting for COLER, J., who was not a member of the court at the time this case was orally argued and did not participate.

BIEGELMEIER, Justice (concurring by opinion).

The wording in Article XIV, § 3, of the South Dakota Constitution and general statements in the cited opinions, some of which are dicta or deal in generalities, point to no clear solution of the question presented on this appeal. Delving into the available Constitutional Debates and the Senate and House Journals of 1895 (S.J. 1895, p. 147) which spawned the now Article XIV, § 3, helps little in shedding light on the resolution of that problem. Grammar, arguably, may be reason to support the Regents' contention that the 10-word restrictive clause applies

only to the number of members of the board, their method of appointment and confirmation and not to their power of "control" feature first declared in § 3.

This court's opinions, from State v. Sheldon, 1896, 8 S.D. 525, 67 N.W. 613 (considering the predecessor Article XIV), down to recent opinions reviewed in Justice Doyle's opinion, give comfort to both views. While in agreement with much of that opinion on this question, it must be blended or reconciled with the verbiage and conclusions in the concurring opinion of Judge Campbell in State ex rel. Prchal v. Dailey, 1931, 57 S.D. 554, 234 N.W. 45, wherein it is stated that the "general scope of the powers of the board * * * are limited by the foundation *purpose* of the school as prescribed by the Legislature (and) [w]ithin those limits the discretion of the board of regents is vast and subject to little, if any, control," and the more sharply drawn verbiage and conclusions of Justice Hanson in Worzella v. Regents, 1958, 77 S.D. 447, 93 N.W.2d 411, wherein he stated, "[w]ithout the right to employ, and the power to discharge, its employees the Board loses its constitutional right of control." (emphasis supplied)

Conceding, as my colleagues Winans and Wollman agree, that there are some limits to the Regents' powers, such as the inability to change the purpose of the school (Prchal) and the power over the purse (the legislative control of appropriations), I cannot agree with them that, as I measure it and Justice Doyle's opinion limits it, SDCL 3-18 is an unconstitutional infringement on the Regents' power of control. To be more specific of those limits, a part of that opinion which impels my concurrence is quoted:

> "The ability of the Regents to unilaterally set salaries, discharge employees, or establish employment qualifications is left intact. The board's basic right of control is left untouched, and SDCL 3-18 is, therefore, a permissible restriction on the exercise of that control."

The legislature has fashioned a uniform procedure whereby state employees may organize and obtain recognition and good faith negotiations with the Board of their claimed grievances as

provided by SDCL 3-18-1.1 through 3-18-2 and 3-18-4 and 3-18-5. Having recognized and heard the positions of the employees, the final decision rests with the Regents and their decision is not subject to further review, regulation or any other of the restrictions in SDCL 3-18, which of necessity include those mentioned in the dissent.

With those express limitations on SDCL 3-18, as applied to the classes of employees here involved, and the further caveat that nothing therein authorizes interference with any of the powers of the Board of Regents over the educational staff, I agree that SDCL 3-18 does not infringe on the constitutional control of the Board of Regents over the educational institutions. From these observations, it follows, as the opinion concludes, that the writ of prohibition issued against defendant Carter be reversed and the Board's action dismissed.

I concur with that part of the opinion that affirms the dismissal of the Attorney General's complaint in intervention.

WOLLMAN, Justice (dissenting in part and concurring in part).

I would hold that the provisions of SDCL 3-18 are an unconstitutional impingement on the Board of Regents' control over its employees.

Perhaps the best explanation of the limitations on the Board's power is that set forth in Judge Campbell's concurring opinion in State ex rel. Prchal v. Dailey, 57 S.D. 554, 234 N.W. 45:

> "As to each educational institution under the control of the regents, it must be held that the general scope of the powers of the board as to courses of study and the kind, type or nature of school that shall, in fact, be maintained, are limited by the foundation purpose of the school as prescribed by the Legislature. Within those limits the discretion of the board of regents is vast and subject to little, if any, control. Beyond those limits there is no question of controlling discretion. There is an utter lack of power and authority to act. Either the limit is there or else no limit of any sort conceivably exists." 57 S.D. 554, 570, 234 N.W. 45, 52.

The Board does not have the power of the purse, State College Development Ass'n. v. Nissen, 66 S.D. 287, 281 N.W. 907, nor can it change the fundamental character of the institutions under its control, State. ex rel. Prchal v. Dailey, supra. The Board's authority to employ and dismiss all officers, instructors, and employees at the institution under its control stems from Art. XIV, § 3 of the Constitution, and not from statute. Worzella v. Board of Regents, 77 S.D. 447, 93 N.W.2d 411.

The majority opinion assumes that SDCL 3-18 will have no real effect upon the Board's control of its affairs vis-a-vis its employees. This is an assumption, not a limitation, and I cannot agree that it is correct. For example, SDCL 3-18-1.1 defines "grievance" as "*   *   *   a complaint by a public employee or group of public employees based upon an alleged violation, misinterpretation, or inequitable application of any existing agreements, contracts, ordinances, policies, rules or regulations of the   *   *   *   board   *   *   *." SDCL 3-18-15.2 provides that if a grievance remains unresolved, "*   *   *   it may be appealed to the department of manpower affairs, which shall conduct an investigation and hearing and shall issue an order covering the points raised, which order shall be binding on the employees and the governmental agency."

SDCL 3-18-2 requires the Board to meet and negotiate in good faith with representatives of the employees in connection with grievance procedures and conditions of employment and requires a statement of rationale for any position taken by the Board in such negotiations. Refusal by the Board to negotiate collectively in good faith with such representatives is deemed to be an unfair practice. SDCL 3-18-3.1. It is the duty of the department of manpower affairs to enforce SDCL 3-18-3.1 by promulgating appropriate rules and regulations. SDCL 3-18-3.3. If the Board declines to grant formal recognition to a proposed unit of employees, the department of manpower affairs shall, at the request of the employees, make an investigation and rule on the definition of the appropriate representation unit. SDCL 3-18-4. SDCL 3-18-8.1 provides that in the event of an impasse or failure to reach an agreement in negotiations a request may be made to have the department of manpower affairs intervene

under the provisions of SDCL 60-10, which authorize the department of manpower affairs to intervene in labor disputes and to investigate and make a recommendation for settlement of the controversy between the employer and employees.

This brief sketch of some of the provisions of SDCL 3-18 belies the statement made in the majority opinion that "The ability of the Regents to unilaterally set salaries, discharge employees, or establish employment qualifications is left intact. The board's basic right of control is left untouched * * *." Cf. Aberdeen Education Ass'n v. Aberdeen Bd. of Education, 88 S.D. 127, 215 N.W.2d 837, 841 (Doyle, J., dissenting). The interposition of the department of manpower affairs between the Board of Regents and its employees constitutes a substantial impingement on the Board's basic constitutional right of control and is in my opinion an impermissible restriction on the exercise of that control.

I concur in that portion of the majority opinion that affirms the dismissal of the Attorney General's complaint in intervention.

I am authorized to state that Justice WINANS joins in this dissent and concurrence.