STATE COLLEGE DEVELOPMENT ASS'N., Respondent, v. NISSEN, Secretary of Board of Regents, Appellant

(281 N. W. 907.)

(File No. 8238.  Opinion filed November 5, 1938.)

*B. H. Schaphorst,* of Brookings, for Appellant.
*C. O. Trygstad,* of Brookings, for Respondent.

PER CURIAM. The Board of Regents proposes to finance the erection of two dormitories on the campus of the State College of Agriculture and Mechanic Arts by using the net revenues of the dormitories, the legality of which arrangement is for determination in this proceeding. The State College Development Association, plaintiff herein, was incorporated for the purpose of assisting in erecting and equipping buildings on the campus of said college. The Board proposes to enter into a contract with the

association and with the First National Bank and Trust Company of Sioux Falls, hereinafter called the trustee, wherein the plaintiff association would agree to furnish fifty-five per cent of the amount required to construct and equip the dormitories and the Board of Regents would agree to repay the plaintiff by pledging the net revenues from the contemplated buildings. The plaintiff will undertake to advance fifty-five per cent of such cost by issuing under its agreement "State College Dormitory Serial Revenue Bonds" and the Public Works Administration has tentatively agreed to grant to the State of South Dakota the balance of the cost of construction. The proceeds from the sale of the bonds are to be deposited by the plaintiff with the trustee and held as a special fund to be expended as directed by the Board of Regents. A copy of these bonds is set out in the proposed contract; it recites that it is "payable solely from the revenues received and to be received from the operation of the dormitories herein above described. * * * This bond is not an obligation or indebtedness of the State of South Dakota, or any Department, Board, or Agency thereof."

The Board under the terms of this proposed contract with the association would agree "(a) To operate said buildings as student dormitories under proper rules and regulations to be prescribed from time to time by the Board; (b) To collect from the students occupying rooms therein reasonable rates and charges for the facilities furnished, which, insofar as possible, shall be sufficient to pay the cost of operation and maintenance as hereinafter provided and to provide sufficient excess or net revenues to pay the principal and interest on the bonds to be issued by the Association; (c) To keep accurate accounts of the receipts and disbursements respecting the operation of said buildings; (d) To charge as operating and maintenance cost all items properly chargeable thereto, including heat, light, water, janitor, matron, and other labor charges, and such repairs and replacements to the buildings and equipment as are necessary to keep the same in first class operating conditions and as good as originally constituted, reasonable wear and tear excepted; (e) To cause all receipts from the operation of such buildings to be paid to the State Treasurer, in accordance with Section 5582 of the Revised Code, as custodian in trust for the purposes of this contract; (f) To cause all operation and maintenance charges to be paid out of the fund in the State Treas-

ury on vouchers authenticated and approved as specified in Section 5585 of the Revised Code; (g) To cause all net revenues, as hereinafter defined, to be paid over to the Trustee as paying agent for the bonds and as Trustee for the bondholders; (h) To use its best efforts to cause the gross revenues of the buildings to be sufficiently large and the operation and maintenance charges sufficiently low so that the net revenues will be sufficient to pay principal and interest on the bonds issued as herein provided." And it is further provided: "All the charges of operation and maintenance as herein defined shall constitute a first and prior claim against the gross revenues of said dormitories. All proceeds received from the operation of said dormitories in excess of said operating and maintenance cost shall be denominated 'net revenues.' Said net revenues shall be paid in amounts and at times appropriate to pay the principal and interest as it falls due to the bank designated as paying agent and trustee, and shall be used to pay the reasonable fees and expenses of such paying agent and trustee, and for the payment of the principal and interest on said bonds." Title to the sites for the buildings, the buildings and all fixtures therein would remain the property of the State under the exclusive control of the Board of Regents and the plaintiff association is forbidden "to cause any lien, encumbrance, or charge to be placed upon any such buildings or equipment."

The principal question before us is whether by entering into this proposed contract the State will incur an indebtedness ·in excess of the limit prescribed by Section 2, Article 13, State Constitution. Plaintiff contends that the contract under consideration pledging ·net revenues from operation of the buildings to pay the bonds, aggregating $154,000, will not impose a general obligation or debt on the State of South Dakota; and that an obligation of the State in excess of the debt limit will not be incurred.

This court has considered what constitutes a debt as this term is used in this section of the Constitution in an advisory opinion to the Governor, In re Opinion of the Judges, 38 S. D. 635, 649, 162 N. W. 536, 542. It was the opinion of the majority of the Judges that the Rural Credits Act did not contemplate the incurring of an indebtedness within the meaning of this section; that the word "debt" as used therein does not include any pecuniary obligation imposed by contract which, within the lawful and reason-

able contemplation of the parties thereto, is to be satisfied out of the current revenues for the year or out of some fund then within the immediate control of the State. The minority of the Judges were of the opinion that the debt limit for Rural Credits purposes was impliedly repealed in 1916 by the amendment of section 1, Article 13, State Constitution, and this view was later adopted by the Court in Schaaf v. Rural Credits Board, 39 S. D. 377, 164 N. W. 964. The provisions of statute before the Court authorized the State to borrow money on its warrants and bonds secured by the good faith and credit of the State and provided that if at any time there should be insufficient funds in the treasury of the Rural Credits Board to pay the bonds or warrants it became the duty of the Tax Commission to make a special assessment and levy. Under the provisions of the statute there was a contingency under which a debt against the State could arise, but under the facts in the instant case no contingency could arise imposing an obligation, moral or otherwise, upon the State of South Dakota, to levy a tax or to appropriate funds to pay any loss that may result from the transactions between the Board of Regents and the plaintiff association. Title to the buildings erected on the campus of the college will be in the State from the time of their erection and no encumbrance or lien thereon will be created. The bonds will not constitute a general obligation against the State. The buildings will be made available to the State under the proposed contract enabling the State to pay for their construction and equipment from earnings accruing from their operation. It has been held in other jurisdictions that the pledge of revenues from a utility or other property in payment thereof does not constitute an indebtedness. The Supreme Court of California in the case of Garrett v. Swanton, 216 Cal. 220, 13 P. 2d 725, referring to the so-called special fund doctrine, said: " 'The overwhelming weight of judicial opinion in this country is to the effect that bonds, or other forms of obligation issued by states, cities, counties, political subdivisions, or public agencies by legislative sanction and authority, if such particular bonds or obligations are secured by and payable only from the revenues to be realized from a particular utility or property, acquired with the proceeds of the bonds or obligations, do not constitute debts of the particular state, political subdivision, or public agency issuing them, within the definition of "debts" as

used in the constitutional provisions of the states having limitations as to the incurring of indebtedness.' * * * Thus it is well established that an indebtedness or liability is incurred when by the terms of the transaction a municipality is obligated directly or indirectly to feed the special fund from general or other revenues in addition to those arising solely from the specific improvement contemplated. It also seems to be well settled, as a second limitation to the doctrine, that a municipality incurs an indebtedness or liability when by the terms of the transaction the municipality may suffer a loss if the special fund is insufficient to pay the obligation incurred." ·

The Supreme Court of Oregon in the case of McClain v. Regents of the University, 124 Or. 629, 265 P. 412, considered a legislative authorization for the issuance and sale of bonds for the construction of a dormitory on the campus of the University of that State. The Court held:

"The only liability is against a special fund which is to be made up exclusively of net rentals. No violation of the constitutional provision against indebtedness is involved. This principle is recognized in Brockway v. Roseburg, 46 Or. 77, 79 P. 335, wherein the court said:

" '* * * There are decisions holding that where, at the time a contract is made by a municipality, a fund on hand is appropriated for its payment, or where a fund has been provided for such payment, although not collected, or an appropriation has been made of an anticipated revenue, and the contract is made payable out of such fund or revenue, it does not create an indebtedness, within the meaning of the Constitution or charter. In such case there is no general liability against the municipality, but the holder of the warrant or other contracting party agrees to look to the special fund for payment.' "

See, also, Baker v. Carter, 165 Okl. 116, 25 P. 2d 747; State v. Regents of University of New Mexico, 32 N. M. 428, 258 P. 571; State v. Davis, 59 N. D. 191, 229 N. W. 105; State v. Regents of University System, 179 Ga. 210, 175 S. E. 567; Fanning v. University of Minnesota, 183 Minn. 222, 236 N. W. 217; Annotation: 72 A. L. R. 687.

■ Counsel for defendant relies upon Hesse v. City of Watertown, 57 S. D. 325, 232 N. W. 53. This case is readily dis-

tinguishable. The proposed bonds considered in that case provided that they were payable from the proceeds of the existing electric light plant; that they were payable from a special fund created not only from income earned by the property purchased by the issuance and sale of the bonds, but from the entire plant. In the instant case there is no attempt to pledge other state property than the specified income. We conclude that if the dormitories are constructed under the proposed plan, a debt will not be created in violation of the constitutional provisions limiting state indebtedness.

Section 5582, Rev. Code 1919, provides: "The state treasurer shall be ex officio treasurer of the board of regents and shall perform all the duties of such office, subject to such regulations as the board may adopt, not inconsistent with any law of this state, and he and his sureties shall be liable on his official bond for the faithful discharge of such duties. Such treasurer shall have authority to receive and receipt for all moneys arising from any source for the use of any of the educational institutions under the control of the board, and he shall keep such separate accounts of the several funds as it shall prescribe. All money received from rents of dormitories, tuition or other fees authorized by the board, or from articles, products or material sold by its authority, shall be collected by some person designated by the board for each institution to make such collections, under proper bonds, and such person shall transmit all money, thus received by him, to the state treasurer at the close of each calendar month or not later than the fifth day of the succeeding month; and no other person shall be permitted to collect or hold any money belonging to such institutions. * * *"

The expenditure of funds collected under section 5582 is directed by the continuing appropriation contained in section 5583: "There is hereby annually appropriated, for the exclusive use of the educational institutions under the control of the board of regents, all money received from their endowment land grant as interest or rent, all local collections from fees of any kind, or rents or authorized sales, all money received from the United States or other source for the proper and legal maintenance of the institutions under its control."

Defendant asserts that under these statutory provisions the net revenues from the contemplated dormitories cannot be used

for the erection of buildings for the conduct of the college; that such income may be used only to pay the current expenses of the institution.

The statute refers to the "legal maintenance of the institutions" under the control of the Board of Regents. The legislature has not restricted the appropriation to the upkeep of physical properties. To maintain an institution denotes a continuous functioning or that which approaches permanency. The legislature has appropriated funds on different occasions for building dormitories at the State College of Agriculture and Mechanic Arts. The trial court found that there has been for many years a constant increase in the attendance at this institution and that there is urgent need for additional dormitory facilities to accommodate and provide for the students in attendance. The action of the board in providing necessary dormitory facilities is consistent with the policy approved by the legislature; the board is not attempting to initiate a new plan for the accommodation of students. The term "maintenance of the institutions" under the control of the board of regents we believe is sufficiently comprehensive to permit the pledging and use of the net revenues as proposed by the Board. See State v. Board of Education, 97 Mont. 371, 34 P. 2d 515. Section 5583 also appropriates for the exclusive use of the educational institutions under the control of the Board of Regents "all money received from their endowment land grant as interest or rent." Section 7, Article 8, State Constitution, provides that the endowment income "shall be inviolably appropriated and applied to the specific objects of the original grants or gifts." Section 11 of the Enabling Act, approved February 22, 1889, provides that interest derived from the permanent school fund shall be expended in support of schools. The question is not presented and we do not determine whether the Board of Regents could expend endowment income appropriated by section 5583 for the construction of buildings.

The final question presented is whether or not the Board of Regents has authority to construct a building which is not expressly authorized by the legislature. The Constitution places the State College of Agriculture and Mechanic Arts and other educational institutions under the "control" of the regents, "under such rules and restrictions as the legislature shall provide." Section 3, Article

14, State Constitution; Johnson v. Jones, 52 S. D. 64, 216 N. W. 584; State ex rel. Prchal v. Dailey, 57 S. D. 554, 234 N. W. 45. Section 5569, Rev. Code 1919, provides: "The board of regents is * * * a corporation, or body corporate, with power to sue and be sued, to hold and manage, for the purposes for which they were established, any property belonging to the educational institutions under its control, collectively or severally, of which it shall in any manner become possessed." In section 5571, there is an enumeration of powers which include the power "to make contracts for service, the erection of buildings, the purchase of all lands, materials and supplies needed." In this section there are also these provisions: "It being intended by this section to confer, and it does confer upon the board of regents all powers usually exercised by such boards and which are necessary to the proper legal management of the educational institutions placed under its control, and the property belonging to the same." These powers are broad and comprehensive and if there are no limitations or restrictions imposed by the legislature the power to construct a building without express authorization from the legislature exists. Counsel for defendant argues that these general provisions must be construed in connection with the provisions of section 5573, Rev. Code 1919. This section provides: "Except as otherwise expressly provided in this code, the board of regents shall have power to govern and regulate each institution under its control in such manner as it shall deem best calculated to promote the purpose for which the same is maintained, and shall have charge and supervision of all buildings and property connected therewith and the construction of all buildings for the same which have been or may hereafter be authorized by law."

Under the extensive powers granted to the Board of Regents, it has been its duty to determine what is necessary for the betterment of educational facilities at the institutions under its control. The Board has had the responsibility of determining the location, the plan of construction of buildings and their use. Since the enactment of the provisions of section 5573 the legislature has not pretended to interfere with the discretion of the Board of Regents in these respects. Special appropriations for the erection of buildings have been made, and the only limitation imposed was that the amount appropriated be applied to the objects of expenditure.

Section 5573 is not restrictive in its terms. It seems to be the purpose of the provisions giving the Board of Regents supervision of construction of buildings hereafter authorized by law to make clear that the Board shall have such authority if an appropriation is made for the construction of a building at an institution under its control without specific provision for supervision of its construction. We cannot agree with the contentions of counsel that specific legislative authority for the construction of the contemplated dormitories is required. No costs to be taxed. The judgment appealed from is affirmed.

ROBERTS, P. J., and POLLEY, WARREN, and RUDOLPH, JJ., concur.

SMITH, J., disqualified and not sitting.